**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| SHELL TRADING (U.S.) COMPANY, | |
| *Movant,* | Case No. 1:24-cv-5206 |
| v. | (Arising from Civil Case No. 1:20-cv-04577 in the United States District Court for the Northern District of Illinois) |
| VEGA CAPITAL LONDON LIMITED and ADRIAN SPIRES, | |
| *Respondents.* | Hon. Manish S. Shah |

**VEGA CAPITAL LONDON LIMITED AND ADRIAN SPIRES'
OPPOSITION TO SHELL TRADING (U.S.) COMPANY'S
MOTION TO QUASH THEIR SUBPOENA TO TESTIFY AT A DEPOSITION**

Michael P. Kelly
AKERMAN LLP
750 Ninth Street, N.W., Suite 750
Washington, DC 20001
(202) 393-6222
michael.kelly@akerman.com

Shawn M. Taylor
AKERMAN LLP
71 S. Wacker Drive, 47th Floor
Chicago, IL 60606
(312) 634-5700
shawn.taylor@akerman.com

*Attorneys for Vega Capital London
Limited and Adrian Spires*

## TABLE OF CONTENTS

INTRODUCTION ..................................................................................................................1

BACKGROUND ..................................................................................................................2

I.      Shell, One of the World's Largest Oil Companies, Was Acutely Aware of the Volatility of Commodity Futures Prices Caused by the Pandemic Before April 20.................................................................................................................................. 2

II.      █████████████████████████████████████████████ ................................................. 4

III.    In the Days and Months after April 20, 2020, Shell Provided Detailed Analysis of Why There Was No Demand for the May WTI Contract ........................ 6

IV.   STUSCO Produces Just 16 Pages of Documents and Then Objects to a Deposition As Unduly Burdensome .................................................................... 8

STANDARD OF REVIEW ...................................................................................................9

DISCUSSION ......................................................................................................................9

I.      A Deposition of STUSCO Is Essential to Establishing Vega and Spires' Defenses ............................................................................................................ 9

      A.     The Deposition of STUSCO Is Relevant to Show the Lack of Demand for Oil Delivered Pursuant to the May WTI Contract ................................... 10

      B.     STUSCO's Deposition Is Necessary Because the Evidence Cannot Be Obtained Through Other Means ..................................................................... 14

      C.     Any Confidential Information Can Be Protected By the Protective Order .......................................................................................................... 15

II.     Topic 17 Should Not Be Quashed In Light of the Necessity of the Deposition and the Paltry Number of Documents Produced by STUSCO ................................... 18

III.    STUSCO Misinterprets Vega and Spires' Efforts to Ease the Burden on STUSCO by Reducing the Number of Depositions ................................................. 19

CONCLUSION....................................................................................................................20

i

**<u>TABLE OF AUTHORITIES</u>**

**Page(s)**

**Cases**

*Buonavolanto v. LG Chem, Ltd.*,
 No. 18-C-2802, 2019 WL 8301068 (N.D. Ill. Mar. 8, 2019) ....................................................9

*CFTC v. Parnon Energy, Inc.*,
 2013 WL 5882921 (S.D.N.Y. Oct. 25, 2013), *aff'd*, 593 F. App'x 32 (2d Cir. 2014) ............10

*Cont'l Auto. Sys., U.S., Inc. v. Omron Auto. Elecs., Inc.*,
 No. 14 C 3731, 2014 WL 2808984 (N.D. Ill. June 20, 2014) ................................................16

*In re Subpoenas to Plains All Am. Pipeline, L.P.*,
 No. 13-mc-2975, 2014 WL 204447 (S.D. Tex. Jan. 17, 2014)........................................10, 17

*Kraft Foods Glob., Inc. v. United Egg Producers, Inc.*,
 No. 11-cv-8808, 2023 WL 5647204 (N.D. Ill. Aug. 31, 2023) (Seeger, J.) ...........................18

*Ruckelshaus v. Monsanto Co.*,
 467 U.S. 986 (1984)................................................................................................................16

*Suture Express, Inc. v. Cardinal Health 200, LLC*,
 No. 14-CV-04737, 2014 WL 6478077 (N.D. Ill. Nov. 18, 2014) ..........................................16

*Trustees of Chicago Reg'l Council of Carpenters Pension Fund v. Drive Constr., Inc.*,
 No. 1:19-CV-2965, 2023 WL 9315453 (N.D. Ill. May 8, 2023)...............................................9

*U.S. Gypsum Co. v. Lafarge N. Am., Inc.*,
 No. 03 C 6027, 2004 WL 816770 (N.D. Ill. Mar. 2, 2004) ....................................................15

*United States v. Zhang*,
 590 F. App'x 663 (9th Cir. 2014).............................................................................................17

*ValveTech, Inc. v. Aerojet Rocketdyne, Inc.*,
 No. 17-CV-6788-FPG, 2023 WL 3558214 (W.D.N.Y. May 19, 2023) ..................................17

*Woven Elecs. Corp. v. Advance Grp., Inc.*,
 930 F.2d 913, 1991 WL 54118 (4th Cir. 1991) ......................................................................17

**Rules**

FED. R. CIV. P. 26.............................................................................................................................9

FED. R. CIV. P. 30...............................................................................................................8, 17, 18

FED. R. CIV. P. 45.............................................................................................................................9

## <u>INTRODUCTION</u>

Shell Trading (U.S.) Company ("STUSCO") is an important fact witness concerning why there was no demand for oil on April 20, 2020.  Based solely on what its officers and employees said, did, and thought (and not acting as an expert witness), STUSCO can provide powerful admissible evidence as to *why* there was no "artificial" price for the May WTI Contract on April 20, 2020.  STUSCO should be required to sit for a deposition to provide admissible evidence in this case.

STUSCO's objections to the subpoena should be rejected.  This deposition seeks relevant and necessary information to show that there are no artificial price on April 20 and that the price on that day was consistent with forces of supply and demand.  No other source is available to

1

obtain this information. ████████████████████████████

████████████████████████████████████████

████████████████████████████████████████████

████████ There is nothing particularly sensitive about this information, especially when

STUSCO's parent corporation provided extensive public analysis on the "unprecedented"

problems with over-supply and "demand destruction." The protective order provides safeguards

for the rest of STUSCO's private information. STUSCO only produced 16 pages of documents

in response to Vega and Spires' subpoena, so there is little-to-no burden in preparing for a

deposition. The Court should reject STUSCO's extreme position that Vega and Spires should not

be able to take the deposition of any large trader in a market manipulation case, and deny

STUSCO's motion to quash.

## BACKGROUND[1]

### I. Shell, One of the World's Largest Oil Companies, Was Acutely Aware of the Volatility of Commodity Futures Prices Caused by the Pandemic Before April 20

STUSCO is a wholly owned subsidiary of one of the world's largest oil companies, Royal

Dutch Shell plc., now known as Shell plc ("Shell"). Ex. 1 at E22. STUSCO is a "corporation

that acts as the single market interface for Royal Dutch Shell companies and affiliates in the

United States." Ex. 2 at 1. It "builds upon the many successful trading activities throughout the

Shell Group of Companies," and "[i]ntegrating these activities positions Shell to leverage its

scale, global reach, talent and financial strength to compete strongly in the evolving energy

trading market." *Id.* at 2. STUSCO's "portfolio includes the buying and selling of physical crude

---

[1]    Because the Court is well aware of the procedural background of this case from the numerous hearings in the underlying action and the three other miscellaneous actions brought with respect to the enforcement of subpoenas, Vega and Spires have limited the background section of this brief solely to the issues raised by the deposition subpoena to STUSCO.

oil, finished products, and feedstocks, as well as trading various paper products, both on exchanges (The New York Mercantile Exchange and The Chicago Mercantile Exchange) as well as over the counter, making it one of the largest petroleum supply organizations in the United States and the world." *Id.* For 2020, Shell reported that it earned $180 billion in revenue, down from $344 billion in 2019. Ex. 3 at 10.

At the very beginning of the COVID-19 outbreak, Shell warned investors about the increased volatility caused by the pandemic and slashed nearly $10 billion of planned costs to prepare for the volatility caused by steeply falling oil demand and rapidly increasing supply. For instance, on March 23, 2020, citing the need to respond to a "unique" "combination of steeply falling oil demand and rapidly increasing supply," Shell announced a series of major cost-cutting measures, including its intent to cut its operating costs by up to $4 billion over the next twelve months and to reduce its cash capital expenditures from $25 billion to $20 billion. Ex. 4 at 1. On March 31, Shell issued an update about the potential impact of COVID-19 on its operations, explaining:

> As a result of COVID-19, we have seen and expect significant uncertainty with macro-economic conditions with regards to prices and demand for oil, gas and related products. Furthermore, recent global developments and uncertainty in oil supply have caused further volatility in commodity markets. The impact of the dynamically evolving business environment on first quarter results is being primarily reflected in March with a relatively minor impact in the first two months. We expect to provide further updates about the impact on our outlook in the first quarter results announcement.

Ex. 5 at 2.





**II.**



███████████████████████████████████████

███████████████████████████████████████████

██████████████████████████████████████

████████████████████████████████████████████

████████████

### III. In the Days and Months after April 20, 2020, Shell Provided Detailed Analysis of Why There Was No Demand for the May WTI Contract

Shell never hesitated to share its analysis of the crude oil commodity markets in public forums. During Shell's quarterly earnings call on April 30, 2020, Shell's chief executive officer, Ben van Beurden, elaborated about the uncertainty facing the market:

- "Today's volatile market is impacting our business now, and it will continue to impact our business in the quarters to come. Oil and gas prices have already moved sharply down this year as the COVID-19 pandemic has significantly reduced demand for crude and for gas and associated products. And at the same time, of course, supply from Saudi Arabia and Russia has increased, and this oversupply then has put further pressure on oil prices." Ex. 11 at 3.

- "I'm not so sure whether by Q2 we will have more visibility. This is a very unusual type of dislocation that we are seeing. It's not just, well, the oil price is down because we have a supply/demand mismatch and it will correct itself. Here, we are looking not just at that. We are looking at a major demand destruction that we don't even know that will come back. So the oil price may come back. But if the volumes are significantly lower, we still have a major dislocation, of course, in our own cash wheel." *Id*. at 16 (emphasis added).

- "Well, I would say, of course, yes, the crisis that has hit us all, it's unprecedented. It has hit the sector in an unprecedented way. And if you look at the report that came out from the IEA today, for instance, the amount of demand destruction that is happening at the moment is completely unprecedented. It will go very, very deep in the coming weeks and months. And for the year, the IEA talks about a demand destruction that is 7x the impact than the demand destruction during the financial crisis. So it is wiping out the demand of equivalent to a country like India at this point in time. So yes, indeed, we -- these things hurt us significantly. And the fact that it's both so disorderly may also hit us in the viability of some of

the operations that we have in the near term. And that is the uncertainty that we are referring to." *Id.* at 25 (emphasis added).[3]

On April 30, Shell slashed its shareholder dividend from $0.47 per share to $0.16, citing the "unprecedented" deterioration in the "macroeconomic and commodity price outlook" Ex. 13 at 1. By cutting its dividend, Shell sought to save another $10 billion for its operations. Ex. 14 at 2. It was the first time Shell had cut its quarterly dividend to shareholders since World War II, prompting questions whether other major oil companies would follow suit. *Id.* at 1.

Finally, as part of its 2020 annual report (which was filed in 2021), Shell provided a comprehensive analysis about what happened to the crude oil market in 2020. Among other things, it explained:

> In 2020, oil markets experienced unprecedented developments in demand driven by the COVID-19 pandemic. At the start of 2020, global oil demand for the year was expected to grow by 1.2 million barrels per day (b/d). Then in January, oil demand started to contract because demand fell in China as lockdown was imposed to contain the virus outbreak. In subsequent months, oil demand contracted further as the outbreak in China evolved into a global pandemic and lockdowns were introduced across the world. In April, oil demand fell to its lowest level, around 22 million b[arrels]/d[ay] below year-average demand in 2019, according to an estimate of the International Energy Agency (IEA). Contraction of such magnitude has never been recorded before. Country lockdowns deeply impacted transportation sectors, especially passenger road and passenger air in Organisation for Economic Co-operation and Development (OECD) economies. . . .
>
> In 2020, oil markets also experienced unprecedented developments in supply. In March, there was a serious disagreement within the OPEC+ alliance, which consists of OPEC members and co-operating non-OPEC resource holders such as Russia. Saudi Arabia and Russia failed to agree on what to do about falling demand for oil. Saudi Arabia responded to the disagreement by boosting its production to almost 12 million b/d, a monthly record. By April, storage capacity was filling up quickly and oil prices were falling rapidly.

---

[3]    The IEA report referenced by Mr. van Beurden projected "that energy demand will fall 6% in 2020 – seven times the decline after the 2008 global financial crisis" and "[i]n absolute terms, the decline is unprecedented – the equivalent of losing the entire energy demand of India, the world's third largest energy consumer." Ex. 12 at 1.

Ex. 3 at 23  (emphasis added).

## IV.    STUSCO Produces Just 16 Pages of Documents and
##          Then Objects to a Deposition As Unduly Burdensome

On November 16, 2023, Vega and Spires served a document subpoena on STUSCO

through its registered agent.  On March 8, 2024, STUSCO produced a total of <u>16 pages</u> of

documents in response to Vega and Spires' subpoena.  The production consisted of: (i) ███

████████████████████████████████████████████████

████████████████████████ (ii) ███████████████████████

███████████████████████ and (iii) ███████████████

████████████████████████████████████████████████

██████████████  STUSCO produced no documents concerning its perception of storage for

oil in Cushing, Oklahoma.  Vega and Spires accepted this production without making any further

document demands of STUSCO.

After reviewing the 16 pages of documents, Vega and Spires (i) informed STUSCO on

April 8, 2024 that it intended to notice a Rule 30(b)(6) deposition of STUSCO and (ii) provided a

list of proposed topics to STUSCO on April 16 while offering to confer about the topics.

STUSCO's counsel informed Vega and Spires on April 23 that it would not accept service of

process of the subpoena through its counsel, so Vega and Spires served STUSCO through its

registered agent on April 24 with a deposition date of May 21.  On May 6 and again on May 13,

2020, Vega and Spires asked to confer again about the deposition topics.  STUSCO's counsel

stated on May 13 that it had "serious reservations about the subpoena" and informed Vega and

Spires on May 15 that STUSCO did not intend to appear for the deposition.  By agreement of the

parties, STUSCO filed the motion to quash in the U.S. District for the Southern District of Texas,

and Vega and Spires filed an unopposed motion to transfer the case to this Court. STUSCO's motion to quash was subsequently transferred to this Court.

## STANDARD OF REVIEW

Federal Rule of Civil Procedure 45 allows parties to subpoena non-parties to attend a deposition related to a civil suit. FED. R. CIV. P. 45(a)(1)(B). "The limits and breadth of discovery expressed in Rule 26 are applicable to non-party discovery under Rule 45." *Buonavolanto v. LG Chem, Ltd.*, No. 18-C-2802, 2019 WL 8301068, at *2 (N.D. Ill. Mar. 8, 2019) (cleaned up). "Accordingly, through a Rule 45 subpoena, parties may seek discovery 'regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case.'" *Trustees of Chicago Reg'l Council of Carpenters Pension Fund v. Drive Constr., Inc.*, No. 1:19-CV-2965, 2023 WL 9315453, at *2 (N.D. Ill. May 8, 2023).

## DISCUSSION

### I.    A Deposition of STUSCO Is Essential to Establishing Vega and Spires' Defenses

The most compelling evidence of the lack of demand for the May WTI Contract is in the possession of the largest oil traders like STUSCO ███████████████ STUSCO cites to a series of cases and argues that district courts should be particularly sensitive to the burdens of third party discovery. ECF 1 at 9-12. But Vega and Spires have been sensitive to limiting the burdens on STUSCO, making very targeted and limited discovery requests with respect both to documents and testimony (concerning the trading of one product on two days). STUSCO's motion does not address sensitivity to undue burdens on third parties, but rather promotes the more extreme argument there should be no depositions of third party traders in a market manipulation case. For the reasons below, STUSCO's argument goes too far.

9

**A.**    **The Deposition of STUSCO Is Relevant to Show the Lack**
**of Demand for Oil Delivered Pursuant to the May WTI Contract**

STUSCO's deposition will be highly relevant to establishing Vega and Spires' defense

that there was no artificial price for the May WTI Contract on April 20, 2020.  A third party

trader's views and actions can be highly probative as to why markets act in the way that they do,

including why there is no demand for a product.  *CFTC v. Parnon Energy, Inc.*, 2013 WL

5882921, at *3 (S.D.N.Y. Oct. 25, 2013), *aff'd*, 593 F. App'x 32, 36 (2d Cir. 2014); *In re*

*Subpoenas to Plains All Am. Pipeline, L.P.*, No. 13-mc-2975, 2014 WL 204447, at **4-5 (S.D.

Tex. Jan. 17, 2014).  *Parnon* and *Plains All Am. Pipeline* were market manipulation cases

involving the WTI contract.  Both courts considered the burdens on third parties and determined

that the discovery should proceed because it sought "highly probative" and necessary evidence.

Throughout its brief, STUSCO does not cite to any market manipulation case addressing

comparable issues.

A deposition of STUSCO is necessary to ███████████████████████

██████████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████



(i) there was an "unprecedented" over-supply of oil with Saudi Arabia flooding the market in a price war with Russia, Ex. 3 at 23, (ii) there was an "unprecedented" destruction of demand for oil in the midst of the pandemic with demand destruction seven times worse than what occurred during the financial crisis of 2008-2009 and simulating the disappearance of the world's third largest energy consumer (India), Ex. 11 at 25, (iii) there was volatility in the commodity markets, Ex. 11 at 3, (iv) storage capacity "was filling up quickly," Ex. 3 at 23, (v) Shell was uncertain that demand for oil would ever return in the same way, Ex. 11 at 16, and (vi) Shell was cutting tens of billions of dollars in costs because of fear of falling commodity prices, Ex. 4 at 1; Ex. 14 at 1-2.

---

[4] 



Likewise, STUSCO's deposition can show the extensive preparations taken *well before* April 20 by major traders like STUSCO, as they sought to save tens of billions of dollars in anticipation of depressed commodity prices brought about by unprecedented over-supply and demand destruction of oil in the midst of a worldwide pandemic.

In an earlier hearing, the Court asked whether a deposition of a third party trader could be conducted without using any documents. *Mish International Monetary Inc. v. Vega Capital London Limited, et al.*, Case No. 1:20-cv-04577, ECF 339 at 12:9-21. But the continued resistance of the third party subpoena recipients makes the proposition of depositions without documents or confidential information untenable. Without the use of documents, the deposition witness can try to deny the obvious or omit key details. *See, e.g.*, *BP Products North America, Inc. v. Vega Capital London Limited*, Case No. 1:24-cv-04226, ECF 17 at 13. The use of documents and highly confidential information is essential to ensuring that truthful and accurate testimony can be elicited from deponents and presented in this case without the prospect of gamesmanship offering empty denials or claims of no memory.

For the same reasons, the deposition of STUSCO employees should not be limited to the three topics to which the Court limited the document subpoenas directed to Vitol Inc. and Glencore Ltd.  Questions limited to those three topics will not elicit evidence necessary to show

█████████████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████████████

███████████████████  If those three topics limit the scope of a deposition, counsel for Vega and Spires would not be able to inquire about STUSCO's preparations for falling WTI commodity prices (including Shell's dramatic expenditure and cost cuts weeks before April 20) or STUSCO's views about the unprecedented market on April 20 (including Shell's belief that demand for oil might never be the same again).  ███████████████████████████████████████

█████████████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████████████

██████████████████████

### B.    STUSCO's Deposition Is Necessary Because the Evidence Cannot Be Obtained Through Other Means

There is no substitute for a deposition of STUSCO in this case.  While STUSCO argues that some trading data has been produced by some traders, ECF 1 at 18-20, none of those trading companies have provided admissible testimony as to why there was no demand for the May WTI Contract.  Plaintiff's own expert admits that he does not know the intent of many of large traders and would have to "speculate" as to why more parties were not buying the May WTI Contract as prices diminished.  Ex. 15 at 534:2-18; *id.* at 549:15-23.  There is no economic model that Plaintiff's expert can create that can explain why market participants like STUSCO silently

withdrew demand from the market. In this case, Plaintiff's expert simply assumes there must have been "non-public information" as to why demand dropped and surmises that it was not because of a lack of storage. *Id.* at 534:2-18. The depositions of STUSCO and other similar trading companies are necessary to fill in this hole in the evidence.

In this context, it is essential, not merely "helpful," that Vega and Spires obtain testimony from companies like STUSCO that will corroborate the expert testimony offered by Defendants and refute the speculative testimony offered by Plaintiff's proposed expert. As the Court has seen from the extensive motion practice in this case, no third party trading company wants to provide testimony. If all major traders are permitted to opt-out from providing testimony about what was driving the lack of demand, the truth-finding functions of the Court will suffer. █



Importantly, STUSCO is not being asked to provide expert testimony about the actions of others, but only fact testimony about what its officers and employees thought, witnessed, believed, and did about the trading on April 20 and 21.

### C.  <u>Any Confidential Information Can Be Protected by the Protective Order</u>

Moreover, Vega and Spires are only seeking to inquire about STUSCO's trading



████████████████████████████████████████████████████

██████████████████████████████████ not give any meaningful strategic

advantage to any competitor on any other day or allow anyone to reverse engineer STUSCO's

trading strategy.[5]

█████████████████████████████████████ While STUSCO claims its

analysis of the market is "highly confidential," ECF 1 at 2, that is rebutted by the frequent public

statements that Shell made about the market for the May WTI Contract.  *See, e.g.*, *Ruckelshaus v.*

*Monsanto Co.*, 467 U.S. 986, 1002 (1984) ("If an individual discloses his trade secret to others

who are under no obligation to protect the confidentiality of the information, or otherwise

publicly discloses the secret, his property right is extinguished").  Shell volunteered to the public

a lengthy analysis ██████████████████████████████████ – including

concerns that the oversupply was "unprecedented," that there was "unprecedented" demand

destruction, that oil demand might never be the same after the pandemic, that storage was rapidly

dwindling, and that Shell was trying to save tens of billions of dollars in light of the pandemic's

drastic effects on supply and demand.

████████████████████████████████████████████

████████████████████████████████████████

██████████████████████████████ ECF 1-4 at ¶¶ 7-20. █████████

---

5       That fact distinguishes this case from those cited by STUSCO.  *See, e.g.*, *Cont'l Auto.*
*Sys., U.S., Inc. v. Omron Auto. Elecs., Inc.*, No. 14 C 3731, 2014 WL 2808984, at *1 (N.D. Ill.
June 20, 2014) (subpoena sought "a wide variety of technical, proprietary information" in a
patent case); *Suture Express, Inc. v. Cardinal Health 200, LLC*, No. 14-CV-04737, 2014 WL
6478077, at *5 (N.D. Ill. Nov. 18, 2014) ("broad subpoena" seeking "information regarding
sales, profits, and market share" was "not necessary" when the subpoena recipient offered to
provide aggregate sales figures); *U.S. Gypsum Co. v. Lafarge N. Am., Inc.*, No. 03 C 6027, 2004
WL 816770, at *1 (N.D. Ill. Mar. 2, 2004) (considering, in a patent case, whether defendant may
use an expert who consulted with competitors of the plaintiff or had to retain another expert).

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

Finally, even if the deposition testimony reveals any genuine trade secrets in how STUSCO traded on April 20, those trade secrets can still be protected by the existing protective order. Upon a proper application from STUSCO, the Court can close the courtroom to protect the interests of any bona fide trade secrets. *See, e.g.*, *United States v. Zhang*, 590 F. App'x 663, 667 (9th Cir. 2014) ("The court reasonably determined that closure [of the courtroom] was necessary to protect Marvell's trade secrets while the witness testified about the contents of the very documents that the government alleged to contain trade secrets"); *Woven Elecs. Corp. v. Advance Grp., Inc.*, 930 F.2d 913, 1991 WL 54118, *6 (4th Cir. 1991) (collecting cases that have "specifically recognized an exception to the public's right of access when a case involves trade secrets"); *ValveTech, Inc. v. Aerojet Rocketdyne, Inc.,* No. 17-CV-6788-FPG, 2023 WL 3558214, at *11 (W.D.N.Y. May 19, 2023) (same).

**II.     Topic 17 Should Not Be Quashed In Light of the Necessity of the <u>Deposition and the Paltry Number of Documents Produced by STUSCO</u>**

STUSCO contends that Topic 17 – which seeks a STUSCO corporate representative to authenticate the sixteen pages of documents produced by STUSCO – should be quashed because this information can be obtained through less burdensome means such as a declaration. ECF 1 at 22-23. There are two fundamental problems with this argument. First, Vega and Spires are seeking to obtain substantive testimony on the merits (not just on authentication of documents) through the deposition of STUSCO's Rule 30(b)(6) representative, and it is not an undue burden for STUSCO to authenticate these documents during the course of a deposition seeking other testimony about the conversations and context around the very same documents. *Plains All Am. Pipeline, L.P.*, 2014 WL 204447, at \*\*4-5 n.8 (rejecting the argument that authentication could be accomplished through less burdensome means when the deposing party sought the testimony "for reasons beyond mere authentication, including the need for testimony regarding the traders' perceptions and reasoning for creating messages relating to certain market conduct in 2008").

Second, STUSCO ignores that it only produced a grand total of 16 pages of documents to Vega and Spires pursuant to the document subpoena. None of the cases cited by STUSCO remotely suggest that it would be an undue burden to authenticate 16 pages of documents in a deposition that must occur anyway. Authenticating 16 pages of documents is hardly a meaningful burden on anyone, let alone one that would reasonably prompt a subpoena recipient to file a motion to quash.

**III.     STUSCO Misinterprets Vega and Spires' Efforts to Ease
the Burden on STUSCO by Reducing the Number of Depositions**

STUSCO argues that it should not be required to designate a Rule 30(b)(6) representative

with the personal knowledge of the facts.  ECF 1 at 23-24.  While that may be correct as a matter

of law, it ignores the practical reality of what would have to follow.  Vega and Spires must

obtain admissible evidence, and there is some doubt in the caselaw as to whether the testimony

in a Rule 30(b)(6) deposition of a representative without personal knowledge is admissible.  *See,

e.g.*, *See, e.g.*, *Kraft Foods Glob., Inc. v. United Egg Producers, Inc.*, No. 11-cv-8808, 2023 WL

5647204, **9-13 (N.D. Ill. Aug. 31, 2023) (Seeger, J.) (discussing conflicting precedent

regarding admissibility of Rule 30(b)(6) depositions of third parties).  If STUSCO chooses not to

present a representative with personal knowledge, out of an abundance of caution, Vega and

Spires might have to take additional deposition(s) of one or two STUSCO employees with

personal knowledge (such as Mr. Catterall), which would surely cause STUSCO to raise

objections of undue burden.  But STUSCO should not be permitted to have it both ways.  The

merits of this case are too important for Vega and Spires, and the evidence ███████████████

███████████████████████████ is too important not to be presented to the Court and/or the

jury in the form of admissible evidence.

## <u>CONCLUSION</u>

For the foregoing reasons, Vega and Spires respectfully request that the Court deny

STUSCO's motion to quash.

Dated: July 3, 2024

Respectfully submitted,

VEGA CAPITAL LONDON LIMITED AND ADRIAN SPIRES

By: <u>/s/ Michael P. Kelly</u>

| | |
|---|---|
| Michael P. Kelly | Shawn M. Taylor |
| AKERMAN LLP | AKERMAN LLP |
| 750 Ninth Street, N.W., Suite 750 | 71 S. Wacker Drive, 47th Floor |
| Washington, DC 20001 | Chicago, IL 60606 |
| (202) 824-1716 | (312) 634-5700 |
| michael.kelly@akerman.com | shawn.taylor@akerman.com |

*Attorneys for Vega Capital London Limited*
*and Adrian Spires*